# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY



#### MARTIN LUTHER KING JR. FEDERAL BLDG. & U.S. COURTHOUSE
##### 50 WALNUT STREET, P.O. BOX 419
##### NEWARK, NJ 07101-0419
#### (973) 645-6340

**WILLIAM J. MARTINI**
**JUDGE**

April 11, 2006

## LETTER OPINION

<u>**VIA REGULAR MAIL**</u>

Helane L. Morrison
Judith L. Anderson
Robert J. Durham
Securities and Exchange Commission
44 Montgomery Street, Suite 2600
San Francisco, California 94104-4691
Morristown, NJ 07962

Susan J. Steele
Assistant United States Attorney
Chief, Civil Division
United States Attorney's Office
970 Broad Street, Suite 700
Newark, New Jersey 07102-2534

(*Attorneys for Plaintiffs*)

Angelica Gwinnett
160 West Midland Avenue
Paramus, New Jersey 07652-1835

(*Defendant* Pro Se)

> Re:   **Securities and Exchange Commission v. U.S. Funding Corp., et al.**
> <u>**Civ. No. 02-2089 (WJM)**</u>

Dear Counsel:

This matter comes before the Court on Plaintiff Securities and Exchange Commission's

(the "SEC") motion for summary judgment against Defendant Angelica Gwinnett ("Gwinnett"). The SEC also moves to strike Gwinnett's affirmative defenses.  There was no oral argument. Fed. R. Civ. P. 78.  For the following reasons, the SEC's motion for summary judgment and motion to strike is **GRANTED**.  Furthermore, the Court shall order various remedies as further explained below.

## **Background**

Gwinnett, a New Jersey resident, was the president, founder and sole owner of defendants U.S. Funding Company and U.S. Funding Corporation (collectively, "U.S. Funding"). (Plaintiff's Statement of Undisputed Material Facts at ¶ 1 [*hereinafter* "Pl.'s SMF"]).  Gwinnett formed U.S. Funding Company in New Jersey in October 2001.  (*Id.* at ¶ 3).  She formed U.S. Funding Corporation, a New Jersey based corporation, in December 2001.  (*Id.* at ¶ 4). Gwinnett's capital contribution of $39,526.00 constituted most of U.S. Funding's start-up capital.  (*Id.* at ¶¶ 8-9; *see also* Affidavit of Louis H. Miron at ¶¶ 9-10 [*hereinafter* Miron Aff.]). Additional start-up capital for U.S. Funding came from investor contributions.  (Pl.'s SMF at ¶ 10).  U.S. Funding's business was factoring commercial accounts receivable.[1]  (*Id.* at ¶ 11).

When Gwinnett started U.S. Funding, she had no prior experience in the factoring business other than performing bookkeeping for two companies that used factoring services and personally funding a one-time factoring transaction for a friend.  (*Id.* at ¶ 12).  Furthermore, she had no formal or informal business plan and did not prepare any profit/loss or other projections for U.S. Funding's operations during its first year.  (*Id.* at ¶ 13).  As president and sole owner of U.S. Funding, Gwinnett controlled the company's finances and was responsible for raising capital to fund U.S. Funding's business.  (*Id.* at ¶¶ 16, 17-18).  In addition, Gwinnett approved all terms of investor agreements used to raise money for U.S. Funding.  (*Id.* at ¶¶ 20-21).

On October 11, 2001, Gwinnett caused U.S. Funding to enter into an agreement with a telemarketing company, Southeast Tracking Technologies, Inc. ("Southeast Tracking"), to assist in U.S. Funding's capitalization efforts.  (*Id.* at ¶ 23).  Gwinnett agreed that U.S. Funding would pay the telemarketing company a 40% commission on all funds it raised for U.S. Funding.  (*Id.* at 25).  On October 31, 2001, the telemarketer subcontracted with another telemarketer, Capital Concept Marketing, Inc. ("CCM") to assist in U.S. Funding's capitalization effort. (*Id.* at ¶ 26-27).  Gwinnett agreed that U.S. Funding would pay CCM a 35% commission on all revenue raised for U.S. Funding.  (*Id.* at ¶ 27-28).

---

[1]In a factoring operation, a firm sells title to its accounts receivable to a factoring company.  The factoring company then advances a percentage of the face value of the accounts receivable back to the firm, charging the firm a customary fee between 1% to 5% of the amount advanced.  The factoring company then assumes responsibility for collecting the full face value of the invoices.  Once this amount is collected, the factoring company deducts the amount of the advance and fee, and refunds the balance to the customer.  *See* Encyclopædia Britannica Online, *http://www.britannica.com/eb/article-9033546?query=factoring&ct=*.

2

Southeast Tracking and CCM sent packages of offering materials to potential investors (the "Investment Materials").  (*See id.* at ¶¶ 32-33, 36).  The Investment Materials contained various documents, such as a cover letter describing U.S. Funding's business, "unaudited" financial statements stating that U.S. Funding had $2.2 million in assets, a list of thirteen "industries serviced," a letter from a satisfied U.S. Funding customer, wiring instructions for investors to wire funds to U.S. Funding's bank account in New Jersey, and a blank Accounts Receivable Purchase Agreement (the "Purchase Agreement") to be executed by the investor.  (*Id.* at ¶ 34).  To make an investment in U.S. Funding, investors transferred their accounts receivable to U.S. Funding by executing the Purchase Agreement (*Id.* at ¶ 37).

The Purchase Agreement promised investors a 20% or 25% return on their investment, depending on whether they entered into a one year or two year agreement with U.S. Funding. (*Id.* at ¶ 40).  The investors received this return through four post-dated checks sent by U.S. Funding.[2]  (*See id.* at ¶ 42).  U.S. Funding agreed to return the entire investment principal at the end of the investment term, unless the investors gave notice that they would re-invest for another year.  (*Id.* at ¶ 44).  In return for this handsome profit, investors did nothing.  (*Id.* at ¶ 57).  All they had to do was transfer their accounts receivable to U.S. Funding and wait for their return.

Between October 2001 and April 30, 2002, U.S. Funding raised approximately $2,530,000.00 from 80 investors (the "Transaction").  (*Id.* at ¶ 29).  U.S. Funding, though, did not register the Transaction with the SEC and no registration statement was filed or in effect as to the Transaction.  (*Id.* at ¶ 31).  All funds received from the investors were deposited into a single bank account and were used for various purposes.  (*Id.* at ¶ 54).  One such purpose was to purchase new accounts receivable.  (*Id.* at ¶ 55).  Other purposes, however, included paying Gwinnett's salary, satisfying her gambling debts, paying for her purchases at various department stores such as Saks Fifth Avenue and Victoria's Secret, and funding several related companies that Gwinnett's family and friends operated.  (*See id.* at ¶¶ 49-52, 55).  In addition, funds in the account were used to pay the telemarketers commissions.  (*Id.* at ¶¶ 49, 55)

The Investment Materials misrepresented and omitted many key facts about U.S. Funding.  For instance, the Investment Materials misrepresented: (1) that as of September 30, 2001, U.S. Funding had over $2.2 million in assets; (2) that U.S. Funding serviced thirteen industries, such as "food," "telemarketing," and "transportation," even though it had not engaged in any such businesses prior to this date; (3) that U.S. Funding was a "privately-funded" business that had operated since 1998; (4) that U.S. Funding owned a substantial portfolio of accounts receivable; (5) that investments in U.S. Funding would be used solely to acquire new accounts receivable; and (6) that U.S. Funding would secure UCC-1 filings to protect the interests of investors.  (*See id.* at ¶¶ 45-52).  Furthermore, the Investment Materials omitted many important facts.  For example, the Investment Materials did not disclose that investors' funds would be

---

[2]For example, an investor who invested $10,000 for a one-year term would receive four post-dated checks of $500, which comprised the 20% return the investor was promise (i.e., $2,000).

used to pay the telemarketers' commissions along with Gwinnett's personal expenses.  (*Id.* at ¶¶ 49-50).

On December 11, 2001, the Pennsylvania Securities Commission sent Gwinnett and U.S. Funding a cease and desist order.  (*See* Declaration of Robert F. Durham at Ex. 7 [*hereinafter* Durham Decl.]).  The order explained that the Purchase Agreements constituted securities and, therefore, must be registered.  (*See id.*)  Because the Purchase Agreements were not registered, the Pennsylvania Securities Commission ordered Gwinnett to cease and desist from selling the Purchase Agreements in Pennsylvania.  (*See id.*).

On May 2, 2002, the SEC filed a complaint against Gwinnett for violating various federal securities laws.  The SEC now moves for summary judgment against Gwinnett, arguing that she violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a) ("Section 17(a)"), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) ("Section 10(b)"), Rule 10b-5, 17 C.F.R. § 240.10b-5, and Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a), (c) ("Section 5(a)" and "Section 5(c)").  The SEC also moves to strike the affirmative defenses contained in Gwinnett's answer to the SEC's complaint.  Furthermore, the SEC requests that the Court order disgorgement of Gwinnett's ill-gotten gains plus payment of pre-judgement interest.  The SEC further requests that the Court impose civil penalties and order Gwinnett to comply with previous orders of this Court regarding the payment of contempt fines and attorneys' fees. Gwinnett does not oppose the SEC's motions.

### Discussion

## I.      Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  Rule 56(e) requires that when a motion for summary judgment is made, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  *See id.*; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  Only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment.  *See Anderson*, 477 U.S. at 247-48.  If the evidence is such that a reasonable fact-finder could find in favor of the nonmoving party, summary judgment should not be granted.  *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Fed. R. Civ. P. 56(e) provides that "if the adverse party does not ... respond, summary judgment, if appropriate, shall be entered against the adverse party."  It is well settled "that this does not mean that a moving party is automatically entitled to summary judgment if the opposing party does not respond."  *Anchorage Assoc. v. Virgin Islands Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990).  The Court must first determine whether summary judgment is appropriate – that is, whether the moving party has shown itself to be entitled to judgment as a matter of law."

*Id.* Furthermore, when considering an unopposed motion for summary judgment, "it is entirely appropriate for this court to treat all facts properly supported by the movant to be uncontroverted." *Allebach v. Sherrer*, Civ. No. 04-287, 2005 U.S. Dist. LEXIS 15626, at *5 (D.N.J. July 27, 2005) (citing *Anchorage Assoc.*, 922 F.2d at 176).

## II.   The U.S. Funding Investments Constitute Securities Under 15 U.S.C. § 77b(a)(1) and § 78c(a)(1).

The initial question the Court must address is whether the investments in question constitute a security.  The SEC contends that the Purchase Agreements are a type of security known as "investment contracts."  *See* 15 U.S.C. §§ 77b(a)(1) and 78c(a)(1) (defining the term "security" as including investment contracts).  The Supreme Court, in *SEC v. W.J. Howery & Co.*, 328 U.S. 295, 301 (1946), provided the test for determining whether an instrument constitutes an investment contract.  Under the *Howery* Test, an instrument is an investment contract if it involves: "(1) 'an investment of money,' (2) 'in a common enterprise,' (3) 'with profits to come solely from the efforts of others.'"  *SEC v. Infinity Group Co.*, 212 F.3d 180, 187 (3d Cir. 2000) (quoting *W.J. Howery & Co.*, 328 U.S. at 301).

All three prongs of the *Howery* Test are satisfied here.  First, the Purchase Agreements involved an investment of money.  *See Steinhardt Group v. Citigroup*, 126 F.3d 144, 151 (3d Cir. 1997) (finding the first prong met where an investment was made with the expectation of an 18% return on investment).  Second, there was a "common enterprise" because U.S. Funding pooled investment income into a single bank account.  *See Infinity Group Co.*, 212 F.3d at 187-88 (noting that the "common enterprise" requirement is satisfied by "horizontal commonality," which is characterized by "'a pooling of investors' contributions and distribution of profits and losses on a pro-rata basis among investors.'") (quoting *Steinhardt Group*, 126 F.3d at 151).  Finally, profits were generated wholly from the efforts of U.S. Funding.  (*See* Pl.'s SMF at 57).  Therefore, the Purchase Agreements are securities as defined by our federal securities laws.

## III.   Gwinnett Committed Securities Fraud Under Section 17(a), Section 10(b) and Rule 10b-5.

_____The SEC contends that Gwinnett committed securities fraud under Section 17(a), Section 10(b), and Rule 10b-5.  "To establish a violation of the anti-fraud provisions of the securities laws, the SEC must show: (1) misrepresentations or omissions of material fact; (2) in connection with the offer, sale or purchase of securities; and (3) that the defendants acted with scienter."  *SEC v. Chester Holdings, Ltd.*, 41 F. Supp. 2d 505, 519 (D.N.J. 1999) (citing *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 453 (3d Cir. 1997); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997); *SEC v. Antar*, 15 F. Supp. 2d 477, 528-29 (D.N.J. 1998)).

Clearly, the Investment Materials contained numerous material misrepresentations and omissions.  A misstatement or omission is material if there is a "substantial likelihood" that a reasonable investor would consider the information important in making an investment decision.

*Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988); *Antar*, 15 F. Supp. 2d at 529.  The facts establish that the Investment Materials misrepresented that U.S Funding was a well-capitalized business, that Gwinnett had extensive experience in factoring, that U.S. Funding had a substantial portfolio of accounts receivable, that U.S. Funding's investments were fully secured, and that investor funds would be used solely to purchase accounts receivable.  Furthermore, the Investment Materials did not disclose that investor funds would be used to pay the telemarketers' commissions or that Gwinnett would use investor funds for personal expenses.  These misrepresentations and omissions created the false impression that U.S. Funding was a well-capitalized and well-run business, with extensive experience in factoring.  An investor would clearly consider such information important in making an investment decision.  Therefore, the first element is satisfied.

The misstatements and omissions were also made in connection with the offer, sale, or purchase of securities.  *See Semerenko v. Cendent Corp.*, 223 F.3d 165, 176 (3d Cir. 2000) (holding that the "in connection" criteria is met when material misrepresentations are "disseminated to the public in a medium upon which a reasonable investor would rely."); *see also SEC v. Adoni*, 60 F. Supp. 2d 401, 405 (D.N.J. 1999) ("[T]he 'in connection with' language of the statute requires a determination whether the plaintiff has 'suffered an injury as a result of deceptive practices touching [the purchase or sale] of securities.'") (citation omitted).  Accordingly, the second element is satisfied.

Finally, the facts clearly establish that Gwinnett acted with scienter.  To prove scienter, the SEC must show that Gwinnett lacked "a genuine belief that the information disclosed was accurate and complete in all material respects."  *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1244 (3d Cir. 1989).  Scienter encompasses both knowing and reckless misconduct.  *See Infinity Group*, 212 F.3d at 192.  "Recklessness" includes:

> "Highly unreasonable (conduct), involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."

*Id.* (quoting *McLean v. Alexander*, 599 F.2d 1190, 1197 (3d Cir. 1979)).  This standard applies to both misstatements and omissions.  *Id.* at 192 n.4 (citing *McLean*, 599 F.2d at 1197)).

The SEC clearly established that Gwinnett acted with scienter in making the material misstatements and omissions.  Gwinnett knew that U.S. Funding was poorly capitalized, that the Purchase Agreements were not fully secured, that investor funds would be used for purchases other than accounts receivable, that the Investment Materials omitted vital information about U.S. Funding's operations, and that Gwinnett lacked the considerable experience in factoring she claimed to possess.  These facts create a scenario in which Gwinnett had to know, or was either reckless in not knowing, that the package of materials provided to investors contained

misrepresentations and omissions of material fact.

Accordingly, the SEC's motion for summary judgment against Gwinnett for violating Section 17(a), Section 10(b), and Rule 10b-5 is **GRANTED**.

## IV.   Gwinnett Violated Section 5(a) and Section 5(c) by Offering to Sell and Selling U.S. Funding Securities in an Unregistered Interstate Offering.

The SEC contends that Gwinnett also violated Section 5(a) and Section 5(c) of the Securities Act.  Section 5(a) makes it unlawful for any person, either directly or indirectly, to sell a security in interstate commerce unless a registration statement is in effect as to that security. *See* 15 U.S.C. § 77e(a).  Section 5(c) further extends this liability to those who offer to sell such securities.  *See id.* § 77e(c).  "To establish a prima facie case of a Section 5 violation, [a plaintiff] must show that '(1) no registration was in effect as to that security; (2) [the defendant] offered to sell or sold the security; and ... (3) [the defendant] used the means of interstate commerce in connection with the offer or sale.'" *SEC v. Hughes Capital Corp.*, No. 88-5238, 1993 U.S. Dist. LEXIS 21283, at *37 (D.N.J. Sep. 2, 1993) (citing *SEC v. Graystone Nash, Inc.*, 820 F. Supp. 863, 873 (D.N.J. 19993), *rev'd on other grounds*, *SEC v. Graystone Nash, Inc.*, 25 F.3d 187 (3d Cir. 1994)).  Once the plaintiff makes this showing, the burden shifts to the defendant to demonstrate that the securities were exempt from the Securities Act's registration requirements. *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953).  A showing of scienter is not required under Section 5.  *Aaron v. SEC*, 446 U.S. 680, 714 n.5 (1980).

The facts clearly establish that Gwinnett violated Section 5(a) and Section 5(c).  No registration statement was in effect when Gwinnett offered to sell, and when she actually sold, the investments in U.S. Funding.  (*See* Durham Decl. Ex's. E and F).  Furthermore, Gwinnett utilized the means of interstate commerce in connection with the offer and sale of the investments by sending the Investment Materials through the mails and internet to potential investors in various states.  (Miron Aff. at ¶¶ 9-10).  Therefore, the SEC's motion for summary judgment regarding Gwinnett's violations of Section 5(a) and Section 5(c) is **GRANTED**.

## V.   Gwinnett is Permanently Enjoined from Future Violations of Section 17(a), Section 10(b), Rule 10b-5, Section 5(a) and Section 5(c).

The SEC asks the Court to enjoin Gwinnett from further violating Section 17(a), Section 10(b), Rule 10b-5, Section 5(a) and Section 5(c).  Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b) ("Section 20(b)"), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), provide that "whenever it appears to the commission that a person is engaged in acts in violation of the securities laws, an action to enjoin those acts may be brought and, upon a proper showing by the commission, the court shall grant the injunctive relief requested." *SEC v. Bonastia*, 614 F.2d 908, 912 (3d Cir. 1980).  To determine whether an injunction should issue in a securities case, a Court must "consider whether there is a reasonable likelihood that the defendant, if not enjoined, will again engage in the illegal conduct." *Id.* (citations omitted).  A court should consider the

following factors, among others, when determining whether an injunction is appropriate: "the degree of scienter involved on the part of the defendant, the isolated or recurrent nature of the infraction, the defendant's recognition of the wrongful nature of [her] conduct, the sincerity of [her] assurances against future violations, and the likelihood, because of defendant's personal occupation, that future violations might occur." *Id.* (citing *SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1048 (2d Cir. 1976)).

An injunction is appropriate in this case. For approximately two years, Gwinnett was the center of a plot to defraud investors by issuing securities containing gross misrepresentations and glaring omissions. Through these misrepresentations and omissions, Gwinnett obtained investments from over 80 individuals. Furthermore, Gwinnett was "on notice" that she was potentially violating federal securities laws when she received the cease and desist order from the Pennsylvania Securities Commission on December 11, 2001. Nevertheless, she continued her unlawful actions, thereby defrauding investors and perpetuating her Ponzi scheme in the process. Therefore, the SEC's request that Gwinnett be enjoined from violating the above-mentioned provisions of the federal securities laws is **GRANTED**.

## VI. The Court Shall Order Disgorgement in the Amount of $636,222.52.

The SEC asks the Court to order disgorgement all profits Gwinnett derived from violating the securities laws. Disgorgement is allowed under Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. It is an "'equitable remedy designed to deprive the wrongdoer of [her] unjust enrichment and to deter others from violating the securities laws.'" *Hughes Capital Corp.*, 124 F.3d at 455 (quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989)). "The SEC has the initial burden of establishing that the disgorgement figure 'reasonably approximates the amount of unjust enrichment.'" *Chester Holdings, Ltd.*, 41 F. Supp. 2d at 528 (quoting *First City Fin. Corp.*, 890 F.2d 1232). The burden then shifts to the defendant to "demonstrate that the disgorgement figure is not a reasonable approximation." *First City Fin. Corp.*, 890 F.2d at 1232. "All doubts concerning the approximation are to be resolved against defendants." *Chester Holdings, Ltd.*, 41 F. Supp. 2d at 528 (citations omitted).

The SEC contends that Gwinnett, individually and as the principal of U.S. Funding, received at least $636,222.52 in profits through violating the securities laws. According to the SEC, this amount consists of: (1) $435,526.00 in net salary and distributions, $25,000.00 from investors deposited directly into her personal bank account, $26,431.00 in cash withdrawals for Gwinnett's benefit from U.S. Funding's account by her personal assistant, and $50,417.00 in payments by U.S. Funding for Gwinnett's gambling bills and her purchases at various department stores, minus her initial capital contribution by her of $39,526.00; plus (2) payment by U.S. Funding of $138,374.52 in total salaries for the benefit of Gwinnett and related persons. After reviewing the documents submitted by the SEC, this amount appears correct. Furthermore, Gwinnett has not contested this amount. Therefore, disgorgement shall be ordered in the amount of $636,222.52.

**VII.   The Court Shall Order Payment of Prejudgment Interest in the Amount of $129,667.36.**

The SEC also requests that the Court award prejudgment interest on the amount ordered disgorged.  "This Court has discretion to award – or not award – prejudgment interest on damages awarded pursuant to the federal securities laws."  *Chester Holdings, Ltd.*, 41 F. Supp. 2d at 529.  "In exercising its discretionary powers, a court must consider both compensation and fairness."  *SEC v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1089 (D.N.J. 1996).  "In the context of Section 10(b) and Rule 10b-5 actions, proof of the defendants' scienter is sufficient to justify an award of prejudgment interest."  *Chester Holdings, Ltd.*, 41 F. Supp. 2d at 529 (citations omitted).  The calculation of prejudgment interest "is based on the IRS rates for underpayment of taxes."  *Hughes Capital Corp.*, 917 F. Supp. at 1090 (citing 26 U.S.C. § 6621(a)(2)).  Using these rates, the SEC determined that prejudgment interest should issue in the amount of $129,667.36.  This amount appears correct and has not been contested by Gwinnett.  Therefore, the Court will award this amount.

**VIII.   The Court Shall Also Order Civil Penalties Against Gwinnett in the Amount of $50,000.00.**

The SEC also asks the Court to order civil penalties against Gwinnett.  Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d)(3), provide that the SEC may seek civil monetary penalties for violations of the securities laws.  The Court will fine Gwinnett because her conduct involved "fraud, deceit, manipulation, or reckless disregard of a regulatory requirement."  15 U.S.C. § 77t(d)(2)(B)(i); 15 U.S.C. § 78u(d)(3)(B)(ii)(i).  Given the nature of Gwinnett's misrepresentations and omissions, and her central role in U.S. Funding, the Court shall assess a civil penalty of $50,000.00.

**IX.   Affirmative Defenses**

Gwinnett's answer to the SEC's complaint contains eleven affirmative defenses.  The SEC now moves to strike these defenses pursuant to Fed. R. Civ. P. 12(f). "If a defense cannot succeed under any set of circumstances alleged, the defense may be deemed insufficient as a matter of law."  *FDIC v. Modular Homes*, 859 F. Supp. 117, 120 (D.N.J. 1994) (citation omitted).  "[A] court should not grant a motion to strike a defense unless the insufficiency of the defense is 'clearly apparent from the pleadings.'"  *DirecTV, Inc. v. Wiekel*, No. 03-5300, 2005 U.S. Dist. LEXIS 9902, at *6 (D.N.J. May 25, 2005) (quoting *Ryer v. Harrisburg Kohl Bros., Inc.*, 53 F.R.D. 404, 408 (M.D. Pa. 1971)).  Keeping these tenants in mind, the Court will examine Gwinnett's affirmative defenses in turn.

**A.   Affirmative Defense No. 1**

Gwinnett's first affirmative defense states that the "complaint fails to state a claim upon which relief may be granted as to the defendants."  (Gwinnett Answer at 7).  Since the Court will

grant summary judgment on all counts against Gwinnett, this defense will be stricken.

### B.     Affirmative Defense No. 2

Gwinnett's second affirmative defense states that the SEC's claims are "barred by the doctrine of estoppel." (Gwinnett Answer at 7). The doctrine of estoppel, however, is not available against the SEC. *S.E.C. v. Morgan, Lewis & Bockius*, 209 F.2d 44, 49 (3d Cir. 1953). Accordingly, this defense will also be stricken.

### C.     Affirmative Defense No. 3

Gwinnett's third affirmative defense states that the SEC's claims are "barred by the doctrine of waiver." (Gwinnett Answer at 7). The doctrine of waiver, however, is also not available against the SEC. *Id.* at 49. Therefore, this defense will be stricken.

### D.     Affirmative Defense No. 4.

Gwinnett's fourth affirmative defense states that the SEC's claims are "barred by all applicable statutes of limitation." (Gwinnett Answer at 7). The SEC's claims for disgorgement and prejudgment interest are not time-barred since no statute of limitations applies against the SEC for such actions. *See SEC v. Antar*, 831 F. Supp. 380, 403 (D.N.J. 1993) (quoting *Dole v. Local 427*, 894 F.2d 607, 610 (3d Cir. 1990)); *see also S.E.C. v. Rind*, 991 F.2d 1486, 1490 (9th Cir. 1993). Furthermore, the SEC's request for civil penalties is not time-barred under the five-year statute of limitations for such actions because the claims first accrued on October 2001, when Gwinnett first offered and sold U.S. Funding securities, and the SEC filed its complaint on May 4, 2002. *See* 28 U.S.C. § 2462 (providing a five year statute of limitations to suits by the government for civil penalties); *see also Rind*, 991 F.2d at 1491. Therefore, the SEC's claims are not time-barred. This defense will be stricken.

### E.     Affirmative Defense No. 5

Gwinnett's fifth affirmative defense states that "[t]his matter is improperly situated in the District of New Jersey." (Gwinnett Answer at 7). Since Gwinnett is a resident of New Jersey and continues to live in New Jersey, venue in this district is proper. *See* 15 U.S.C. § 77v(a) (providing that venue is proper "in the district wherein the defendant is found or is an inhabitant or wherever the defendant may be found."); 15 U.S.C. § 78aa (same). Therefore, this defense will be stricken.

### F.     Affirmative Defense No. 6

Gwinnett's sixth affirmative defense states that the SEC "has improperly joined Defendants [sic] with the other defendants in this matter." (Gwinnett Answer at 7). This defense will be stricken because the claims against the defendants arise out of the same transactions and

10

occurrences, and questions of law and fact are common to all defendants.  *See* Fed. R. Civ. P. 20(a) (providing that joinder of defendants is proper "if there is asserted against them jointly ... any right to relief in respect of or arising out of the same transaction [or] occurrence ... and if any question of law or fact common to all defendants will arise in the action.").  Accordingly, this defense will be stricken.

### G.     Affirmative Defense No. 7

Gwinnett's seventh affirmative defense states that the SEC failed to plead fraud with particularity.  (Gwinnett Answer at 7).  Fed. R. Civ. P. 9(b) states that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake must be pleaded with particularity." In addition, under the Private Securities Litigation Reform Act, complaints alleging securities fraud must set forth "each statement alleged to be misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  Furthermore, in securities fraud claims where the recovery of monetary damages is contingent on proof that the defendant acted with a particular state of mind, the PSLRA requires that the complaint "also state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind."  *Id*. § 78u-4(b)(2).  Upon reviewing the complaint, it is clear that the SEC more than satisfied these pleading requirements. (*See* Compl. ¶¶ 1-4, 12-20, 21-28, 29-31, 32-34, 35-38).  Accordingly, this defense will be stricken.

### H.     Affirmative Defense No. 8

Gwinnett's eighth affirmative defense states that "Defendants [sic] acted consistent with the standards and customs as well as the rules and regulations pertaining to customary industry practice" (Gwinnett Answer at 7).  The Court is not aware, however, of any industry "standards and customs" that trump our nation's federal securities laws.  The purpose of the securities laws, in fact, was to accomplish the exact opposite.  *See, e.g., SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963) (noting that the "fundamental purpose" of the securities laws "was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry.").  Therefore, this defense will be stricken.

### I.     Affirmative Defense No. 9

Gwinnett's ninth affirmative defense states that she has not injured any of her customers and that she acted "fairly and in good faith in carrying out her business policies, practices and procedures."  (Gwinnett Answer at 8).  This defense will be stricken.  First, "'[u]nlike private litigants seeking damages, the [SEC] is not required to prove that any investor relied on the misrepresentations or that the misrepresentations caused any investor to lose money.'"  *Adoni*, 60 F. Supp. 2d at 405 (quoting *SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir. 1985)).  Second, a good

11

faith belief will not insulate a defendant from fraud liability based on reckless conduct or liability stemming from a Section 5 violation.  *See Infinity Group*, 213 F.3d at 193; *SEC v. Friendly Power*, 49 F. Supp. 2d 1363, 1368 (S.D. Fla. 1999).

### J.      Affirmative Defenses No. 10 and No. 11

Finally, Gwinnett's tenth and eleventh affirmative defenses state, respectively, that the SEC has no authority to bring this suit because there is no security at issue and because this Court lacks subject matter jurisdiction.  These defenses must be stricken.  As noted above, the Purchase Agreements constitute a security and, since a security is at issue in this matter, this Court has subject matter jurisdiction under the federal securities laws.  *See* 15 U.S.C. §§ 77t(d)(1), 77v(a), 78u(a)(3), 78u(c) and 78aa.

### X.      Enforcement of Civil Contempt Order and Award of Attorneys' Fees

The last item of relief the SEC seeks is an order from the Court compelling Gwinnett to comply with two of our previous orders.  On September 11, 2003, this Court granted the SEC's request to hold Gwinnett in civil contempt for violating a temporary restraining order issued by United States District Judge Katherine S. Hayden on May 2, 2002, which froze Gwinnett's and U.S. Funding's assets.  The Court assessed Gwinnett $22,327.44 in sanctions for violating Judge Hayden's order.  The SEC then filed an application for attorneys' fees and costs for pursuing the contempt action.  On October 23, 2003, the Court granted the SEC's request and ordered Gwinnett to pay $17,188.48 in attorneys' fee and costs.  These amounts still remain unpaid.  As such, the Court will order Gwinnett to pay these amounts.

<u>Conclusion</u>

For the foregoing reasons, the SEC's motion for summary judgment is **GRANTED**.  Furthermore, the SEC's motion to strike Gwinnett's affirmative defenses is **GRANTED**.  The Court shall also order Gwinnett to disgorge $636,222.52 in profits, pay $129,667.36 in pre-judgment interest, and pay $50,000.00 in civil penalties.  In addition, Gwinnett shall be ordered to pay $22,327.44 pursuant to this Court's previous order sanctioning Gwinnett for violating Judge Hayden's restraining order, and $17,188.48 pursuant to this Court's previous order awarding the SEC attorneys' fees.  Finally, Gwinnett shall be enjoined from further violating Section 17(a), Section 10(b), Rule 10b-5, Section 5(a) and Section 5(c).

s/ William J. Martini
**William J. Martini, U.S.D.J.**

cc: The Honorable Ronald J. Hedges, U.S.M.J.

12